Argued and submitted July 20, affirmed November 9,
reconsideration denied December 17, 1981,
petition for review denied January 19, 1982 (292 Or 450)

## URBAN RENEWAL AGENCY OF THE CITY OF SALEM,
*Respondents,*

*v.*

## SWANK,
*Respondent,*

## SALEM SCHOOL DISTRICT 24 J et al,
*Intervenors-Respondents,*

## JEFFERSON SCHOOL DISTRICT NO. 14J et al,
*Intervenors-Appellants,*

*and*

## NORTH MARION SCHOOL DISTRICT NO. 15,
*Intervenor,*

*v.*

## SWANK,
*Respondent.*

(No. 118,008, CA 19011)

635 P2d 1344

Paul J. De Muniz, Salem, argued the cause for intervenor-appellant Jefferson School District No. 14J. With him on the briefs was Garrett, Seideman, Hemann, Robertson & De Muniz, P. C., Salem.

Robert G. Burt, Portland, argued the cause for intervenor-appellant City of Woodburn. With him on the briefs were David R. Ludwig and Burt & Hagen, P.C., Portland.

David J. De Martino argued the cause for respondents Urban Renewal Agency of the City of Salem. With him on the brief was William J. Juza, Salem.

John W. Osburn, Portland, argued the cause for respondent Charles A. Swank. With him on the brief was Rankin, McMurry, Osburn, VavRosky & Doherty, Portland.

William G. Paulus, Salem, argued the cause for intervenors-respondents Salem School District 24J, et al, and St. Paul Fire District and Silverton Fire Protection District No. 2. With him on the brief was Paulus & Callaghan, Salem.

James D. Tiger, Stayton, waived appearance for intervenors-respondents Stayton Rural Fire Protection District, Aumsville Rural Fire Protection District, Turner Rural Fire Protection District, Mill City Rural Fire Protection District, Sublimity Rural Fire Protection District, Sublimity School District 7C, Mari-Lynn School District 29J, and City of Sublimity.

Robert C. Cannon, Legal Counsel, Salem, waived appearance for intervenor-respondent, Board of Commissioners for Marion County.

Dennis W. Bean, Silverton, waived appearance for intervenor-respondent City of Silverton.

Paul Lee, Stayton, waived appearance for intervenor-respondent City of Stayton.

Thomas B. Brand, Salem, waived appearance for intervenors-respondents Detroit-Idanha Rural Fire Protection District and Cloverdale School District No. 144.

Robert G. Burt, Portland, waived appearance for intervenor-respondent City of Donald.

No appearance for intervenors-respondents Marion County Fire District No. 1 and Salem Suburban Rural Fire Protection District.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Appellants appeal from a declaratory judgment, equitable in nature, allocating losses incurred in the Marion County Treasurer's investment of appellants' and others' funds of which he had custody. We affirm.

### Trial Court Opinion

The facts are long and complex, involving many parties.[1] The trial court's opinion summarizes them:

"This litigation involves the loss of some $18 million by the Marion County Treasurer of funds in his custody. The loss was caused by improvident or unlawful investment in 'standby commitment' and 'forward commitment' agreements.[1] These 'standby' and 'forward' agreements with investment brokers covered the purchase of long-term and speculative Governmental National Mortgage Association certificates (Ginny Mae's).

The Treasurer operated a pool for investment of the funds of some 85 taxing units. As the bond market dropped in value, the Treasurer was unable to meet his statutory and contractual commitments to pay the various taxing districts to operate their school, fire, drainage, water supply, sanitary, lighting, educational service, community college, and county service districts, cities, urban renewal projects and the county, all within Marion County. Also, he could not account for various special funds paid him, such as Timber Revenue. At this time, or by late 1978, the Treasurer began his speculation in the above mentioned 'standby and forward agreements.' The loss occurred as sales were necessary. There were no winners in this litigation. The taxpayers within the county and the separate taxing units are the losers and the problem to be resolved is how much loss each taxing unit must realize.

---

[1]

"A 'forward commitment' is an agreement to purchase a security at a stated future time at a stated price or yield; a 'standby commitment' is an agreement whereby the purchaser is paid an immediate 'commitment fee' in exchange for an agreement to purchase the securities at a stated future price or yield if the owner of the security exercises his option to sell."

---

[1] We commend counsel for their comprehensive treatment and explanation of difficult facts and accounting procedures.

"* * * * *

"* * * The evidence shows that the money in the hands of the Marion County Treasurer has recently fluctuated between 70 and 20 million dollars during the tax year—and finally to a deficit.

"* * * * *

"The evidence discloses the following: The former Treasurer, Mr. Robert E. Coe, Jr., began the practise, several years ago, of having public taxing units deposit funds with the Treasurer for investment in the pool, whether or not required by statute. He then issued written, oral or customary investment or participation certificates to the taxing units at various rates of interest. Some of the funds went into an 'open account' and then transferred to the 'Investment Pool.' Other funds went directly to the 'Investment Pool.'

"Mr. Coe was not called as a witness by any of the parties (a fact difficult to understand). Mr. Ralph Grim became County Treasurer January 1, 1980 to March 14, 1980 upon Mr. Coe's retirement. He had previously served as Deputy-Treasurer. He testified as to the manner of issuing certificates of investments or participation and that there was no statutory authorization for this practise. He also testified that, after first written, 95% of the certificates were on an oral understanding with the taxing units; that all monies were invested except one million dollars for operation capital; that interest on funds in an open account was returned to the open account *if requested* and otherwise it was returned to Marion County's general fund at the end of the year; that expenses or losses were charged to the unsegregated interest account and on specific investments losses were charged to that account; that by October, 1979, they knew that the bond investment portfolio would not meet the taxing units' lawful withdrawal amounts; that in January, 1978, the Treasurer executed the first 'standby commitment' and the first 'forward commitment' in March, 1979; that the bond funds, tax money and other receipts were all treated the same and pooled together; that specific funds could not be traced to certain investments with losses or gains except the cash kept on hand. There is no specific testimony as to the cash on hand on any particular date or if it was subsequently invested through the pool.

"As the debacle heightened, the County Commissioners requested the State Division of Audits to examine the records of the Treasurer and make an audit. This was done

as shown by [The Division of Audits' report]. These exhibits form the only complete audit, supplemented by oral testimony, given to the court.

"William L. Miles, Assistant Audit Supervisor, and Steve Caputo, both Certified Public Accountants with the State Division of Audits, testified as to their findings, method and conclusions in preparing [the Division of Audits' report].

"Mr. Miles, a disinterested witness who has been performing government or municipal audits with the State of Oregon for 20 years, gave the most competent, relevant and truthful testimony on the issues of any witness. Both on direct, redirect, and cross-examination he proved to have a completed grasp of the issues.

"Mr. Miles reviewed each individual account as shown in the exhibits to determine the amount of interest earned, gains and losses. He, with Mr. Caputo, developed the computer program by which the audit was made. There is testimony that the audit was made in accordance with sound, generally accepted accounting principles. Mr. Caputo testified there are over 400 accounts and 400,000 individual records. Mr. Grim testified he believed that the audit by the State Audit Division covered all money in the Treasurer's office. The evidence indicates that the records of the Treasurer's office, prior to the appointment of the present Treasurer, and defendant, Mr. Swank, a C.P.A. were not the best to be desired.

"Mr. Virgil Elkington, a capable C.P.A. familiar with the Treasurer's records, was called as a witness by Marion County. He testified that the program developed by the State Division of Audits covered 400,000 transactions and that it was 'excellent-commendable'; that the Treasurer had no authority to issue fixed rate certificates or pool the funds; that investors (taxing districts) should share losses and gains. He did not agree with the audit method of handling the actual daily interest earnings or the three fiscal periods used in the audit or the $1,400,000 loss attributable on the 'Open, Residual or Demand Cash Account' * * *.

"The Audit Division established seven 'Account Types' * * *. They also established three 'Fiscal Periods' * * * for the period from August 1, 1977 to January 21, 1980. Several of the taxing units called witnesses to establish their investments and losses, particularly the City of Salem, Marion County, Salem School District 24J, City of Woodburn (bonds-construction fund), North Marion School

District 15 (bonds-construction fund); Jefferson School District 14J (bonds-construction fund), the rural fire districts, and other school districts and community college.

"On rebuttal, Mr. Miles testified that he considered the suggestions of Mr. Elkington but that these contentions would cause more distortion in the result than the audit submitted by the State Audit Division * * *.

"This is a brief summary of the facts. It is impractical to attempt to set forth all of the facts covered by the testimony and numerous exhibits. I have carefully read all of the post-trial memorandums submitted by counsel and considered their contentions. I have also read each Oregon statute referred to during trial and in the memorandums submitted.

"* * * * *

"At the close of the case I stated that I was concerned about funds invested in the pool from bond issues. I have reviewed the statutes and the facts which include the point that no particular funds within the pool could be traced to a particular investment. * * * I have concluded that all funds invested in the pool must be treated as shown by the audit of the State Division of Audits. This is a harsh treatment of these taxing bodies with long-term effect * * *.

"* * * * *

"I affirm the audit, assumptions and findings of the Division of Audits * * *.

"* * * * *

"Based on all of the evidence, the court concludes that the cut-off date for participation in the pool, as to losses, is January 21, 1980. There was no evidence that deposits after January 21, 1980, were part of a pool. In fact, the 'pool' was broke." (Emphasis in original.)

## The Division of Audits Report

In preparing its report, the Division of Audits (Division) relied on the assumptions set out in the appendix to this opinion. It then divided its task into three areas: 1) determining amounts of interest income, gains and losses from the treasurer's investment transactions; 2) developing a computer program to calculate those amounts; and 3) classifying the accounts of the parties to determine which would participate in allocation of those amounts and the extent of that participation.

### Additional Facts

For clarity, we will refer to appellants as "Jefferson" and "Woodburn," to former Treasurers Coe and Grim as "treasurer," and to Marion County Treasurer Swank as "Swank" or "respondent."

In March, 1980, respondents Urban Renewal Agency and City of Salem sued to enjoin the treasurer from liquidating the investment pool and allocating its losses to the participants. The trial court issued a temporary restraining order on March 6, 1980. By March 10, 1980, 18 school districts and the Board of County Commissioners for Marion County intervened as plaintiffs and filed a complaint for declaratory judgment. Jefferson was one of those intervenors. The trial court then issued a temporary injunction, which was later modified; it was dissolved at trial in June, 1980. On May 13, 1980, the court consolidated this case with two related suits against the treasurer and ordered joinder of all other Marion County public governmental bodies, including Woodburn, that had funds in the county treasury between August 1, 1977, and January 21, 1980, the date the treasurer froze the accounts.

On June 10, 1980, a week before trial, Woodburn moved for a 60-day continuance to complete discovery and pretrial preparation. The trial court denied the continuance and Woodburn sought a writ of mandamus or stay from the Oregon Supreme Court; both were denied.

Both appellants had funds on deposit in the county treasury between August 1, 1977, and January 21, 1980. The bulk of their funds represented sale proceeds from construction bonds. Both appellants had authorized the treasurer to invest the funds, which the treasurer treated as part of the investment pool. Both appellants periodically withdrew funds from the treasury to pay construction costs, so that by January 21, 1980, when their accounts were frozen, their account balances were greatly reduced.

### JEFFERSON

■ Jefferson contends that invested proceeds of its school district bond issue were improperly subjected to investment losses, because 1) the county treasurer has no authority to invest Jefferson's bond proceeds and 2) bond

construction money is different from money "voluntarily" placed with the treasurer for investment. Jefferson relies on ORS 328.255(2)[2] and 328.441(4) and (5),[3] which require the county treasurer to hold school district bond proceeds until drawn for school district use and which limit "use" of those proceeds to the purpose for which the bonds were issued. Jefferson argues that because "investment" of its bond proceeds was not a "use" authorized by these statutes, the Division should not have included them as part of the "investment pool" to which investment gains and losses were allocated. We disagree.

■ We read those statutes to limit *use* and *disbursement for use* of those proceeds *by the school district,* as distinguished from the county treasurer's *custody* over them, which is governed by other statutes, including ORS 294.035:

> "* * *[T]he custodial officer may, after having obtained a written order from the governing body of the county, municipality, political subdivision or school district, which order shall be spread upon the minutes or journal of the governing body, invest *any* sinking fund, *bond fund* or surplus of funds in his custody and designated in the order in the following * * * investments * * *." (Emphasis supplied.)

When possible, we must attempt to construe statutes on the same subject to achieve consistency, and we may not ignore the plain meaning of their words. *Davis v. Wasco IED,* 286

---

[2] ORS 328.255(2) provides:

> "(2) The county treasurer or county fiscal officer shall hold the proceeds of the sale of the bonds or warrants for all school districts except county school districts subject to the order of the district school board to be used solely for the purpose for which the bonds or warrants were issued. The treasurer or fiscal officer, as soon as practicable, shall deliver the proceeds of the sale of the bonds and warrants to the person designated as custodian of the county school district funds under subsection (2) of ORS 328.441."

[3] ORS 328.441(4) and (5) provides:

> "(4) The county treasurer shall be custodian of funds of all school districts other than those provided for in subsections (1) and (2) of this section. School district funds in the county treasurer's custody shall be disbursed only upon warrants drawn on the county treasurer by the district school board in the manner provided by law.

> "(5) The proceeds of the sale of school district bonds or warrants shall be used solely for the purpose for which the bonds or warrants were issued, including reduction of existing bond or warrant indebtedness."

Or 261, 266, 272, 593 P2d 1152 (1979). The statutes we consider here deal in part with the same subject: school district bond proceeds. The terms in question are "use," "disbursement," "custody," and "invest." The first two are part of statutes in ORS ch 328, dealing with local financing of education; the second two are part of ORS ch 294, dealing with local government financial administration. On reviewing those chapters and the specific statutes in question, we conclude that our distinction between use and custody results in consistent construction and does not ignore the words' plain meaning and obvious intent. ORS 328.255 and 328.441 restrict *school districts'* use of bond proceeds, both as to time (when the funds are disbursed and available to school districts) and as to purpose (that for which the bonds were issued). Those statutes govern *custody* of the funds before use by a school district only as to the custodian's identity and time of and authorization for disbursement to the school district.

ORS 328.255(2) does provide that "the county treasurer * * * shall *hold* the proceeds * * *." (Emphasis supplied.) ORS 294.035 defines the *manner* in which the treasurer as custodian, holds them:[4] upon the school district's written order, the custodian may *invest any* bond proceeds in his custody. Jefferson provided written authorization for the treasurer to invest its funds that were in his custody.[5]

ORS 294.035 does not distinguish between voluntarily and involuntarily placed funds. Read together, ORS 294.035, 328.255 and 328.441 do not define the treasurer's investment of school district proceeds as "use." That the treasurer pooled the proceeds with those of other governments for investment, therefore, was not "use," proper or

---

[4] ORS 294.035 was, before this trial, last amended in 1977; ORS 328.441 was last amended in 1975 and ORS 328.255 in 1965. Because we construe the statutes to be consistent and not in direct conflict, we need not decide whether ORS 294.035 impliedly repeals inconsistent provisions of ORS 328.255 and 328.441.

[5] Jefferson does not claim that the treasurer invested its funds contrary to its authorization but only that investment was unauthorized "use" under ORS 328.255 and 328.441. However, Jefferson noted in its brief that a plain reading of those statutes indicates that the treasurer would be prohibited from using the proceeds for "long term" investment, and so impliedly conceded that investment for less than long term is not misuse.

improper, but was the manner in which the treasurer exercised custody. The Division properly treated the funds as part of the investment pool and subject to the pool's losses.

## WOODBURN

### 1. Motion for continuance

■ As Woodburn acknowledged in its brief, a motion for continuance "is addressed to the sound discretion of the trial court, [whose] action thereon will not be reviewed, except for a clear abuse of discretion." *Sims v. Sowle,* 238 Or 329, 331, 395 P2d 133 (1964). We do not find clear abuse here.

■ More than 100 governments were parties below. Of more than 70 that were joined when Woodburn was joined, only one other requested continuance before trial. Woodburn participated in deposing key witnesses and otherwise received or had access to as much information as did other parties similarly situated. It had 33 days to prepare. Although that is not much time for a case of this magnitude, other similarly situated parties found it adequate. Woodburn failed to show how its position was different; it failed to show or even to estimate its potential or actual damage resulting from the denial. The trial court weighed Woodburn's need for more preparation time against the need of all parties and of their constituencies for timely resolution of this important problem. Further delay might have prejudiced others more than it might have helped Woodburn. The denial of Woodburn's motion for continuance was not arbitrary or otherwise an abuse of the court's sound discretion.

### 2. Division of Audits Report

Woodburn's second assignment of error is very broad: it argues that the trial court erred in adopting the Division's report because the report "does not *equitably* state the status, amounts, and rights of all accounts * * * and, in particular [of] Woodburn's account in the Marion County Treasurer's office." (Emphasis supplied.) Woodburn points to six "inequities":

a. awarding judgment against Woodburn for more than its account balance in the investment pool, *i.e.,* judgment for a deficit; when its account was frozen;

b. treating funds invested for stated interest and designated periods, represented by Certificates of Participation (CIP's), as "pooled" investments;

c. allocating the pool's gains and losses and interest income on a fiscal-year, rather than a monthly basis;

d. failing to attribute the pool's losses to months when the pool actually realized them;

e. failing to allocate the pool's standby commitment fees to months when the pool actually earned them; and

f. attributing the pool's income and investment gains and losses realized after the accounts were frozen to the fiscal year in which the accounts were frozen.

This proceeding is equitable in nature. In reviewing a case for declaratory equitable relief we must try the case "anew upon the record." ORS 19.125(3). Woodburn complains of inequity; our review of the record reveals, at most, some imprecision.

### a. Judgment for Deficit

Woodburn contends that pool losses could be allocated only to the extent of its deposits with the treasurer as of January 21, 1980, when its account was "frozen." Woodburn compares this proceeding to bankruptcy, receivership, and interpleader. It is none of those, and their special rules do not apply here.

The Division's report did no more than state the parties' accounts as they would have been stated had the treasurer properly allocated investment losses when he should have realized and recognized them. Because the treasurer did not keep them current, the accounts appeared to have sufficient funds to cover periodic withdrawals from the treasury to pay construction costs. Those funds were, in fact, not available for withdrawal; they had been lost by imprudent investments. When Woodburn withdrew funds during the accounting period, it was actually borrowing funds from the county treasury because, allocating to it a fair share of the losses, it had insufficient funds on deposit with the treasurer to cover its withdrawals—that was (and is) the "deficit." The Division's report did not create the

deficit but rather brought the accounts current in an equitable way by amortizing losses against funds invested during fiscal periods when losses should have been recognized.

The Division's report treated the investment pool participants' accounts ratably. We agree with respondents: participants that withdrew funds before the accounting date should be in no better position than those that did not. It would be inequitable to place the total burden of loss on participants that had not withdrawn funds subject to loss and therefore actually had funds on deposit on January 21, 1980.

### b. Certificates of Investment (CIP's)

■ Woodburn invested with the treasurer certain funds for fixed periods at stated interest, for which the treasurer issued CIP's. Woodburn argues that the CIP's were contracts for investment, that CIP funds were not pool investments, and that they should not be subject to pool losses. We disagree.

The CIP's were no more than a bookkeeping tool representing funds that were pooled for investment. The treasurer had no statutory authority to guarantee a certain return or to contract to pay interest on invested funds beyond that actually earned. The Division's report properly allocated interest *actually* received or earned as required by ORS 294.080.[6] Further, the report treated CIP funds as

---

[6] ORS 294.080 provides:

"(1) Except as provided in subsections (2) and (3) of this section, the county treasurer shall credit to the general fund of the county all interest received from any investment made from the general cash balance of any funds in the hands of the county treasurer. If the entire investment is made from a specific fund, however, the treasurer shall credit the interest to the fund from which the investment was made.

"(2) The county fiscal officer of a community college district, as defined in ORS 341.005, shall credit to the general fund of the district all interest received from any investment made by funds in the hands of the county fiscal officer. If the entire investment.is made from a specific fund, however, the county fiscal officer shall credit the interest to the fund from which the investment was made.

"(3) Interest earned by investment of any moneys received by the county treasurer from any source, which moneys have been designated for a particular municipal corporation as defined in subsection (19)of ORS 294.311, shall be credited to the account of the particular municipal corporation and not to any county fund."

the treasurer had held them: as part of the investment pool and not able to be separately identified. CIP funds were funds subject to investment under ORS 294.035 and subject to investment loss.

### c-e. Fiscal Year Allocations

■ The common theme of Woodburn's complaints c, d and e is that the Division's report should have allocated gains, losses, interest, and standby commitment fees on a monthly, rather than a fiscal year, basis and, thus, to those months when losses and earnings were actually realized.

Respondent Swank concedes that a fiscal year approach was probably detrimental to Woodburn; but Woodburn has not, here or at trial, offered evidence to show what it would gain by such monthly allocations. It argues that the audit did not follow accepted accounting principles and cites authorities not introduced at trial and first raised in its post-trial memorandum. Those authorities are either inapposite (Securities and Exchange Commission rules on mutual funds) or require us to undertake a form of judicial notice, which we cannot do here. There is sufficient evidence of record, including testimony of Virgil Elkington, auditor for Marion County, that the fiscal year allocation was within generally accepted accounting principles. Although Mr. Elkington did not agree with every aspect of the report, he admitted he had no more efficient program and found the Division's program to be "outstanding."

We conclude from the record that fiscal year allocation was reasonable and equitable, even if not exact. We further conclude that allocation of unrealized losses to years when they should have been realized was reasonable. Mr. Elkington testified that such allocations were not a departure from accepted accounting principles.

The report treated standby commitment fees as income or loss realized in the fiscal year when the option was exercised. Woodburn argues that those fees should have been allocated on a monthly basis from time of commitment to time of sale. Although Mr. Elkington testified that he would have followed Woodburn's approach, he admitted that it was "just another theory" and that the Division's allocation was equally appropriate. It was certainly consistent with treatment of other investment gains

and losses, and nothing in the record indicates that it was unreasonable or inequitable.

### f. Interest, Gain and Loss Realized After Accounts Were Frozen

Before the accounts were frozen on January 21, 1980, investment pool participants were unaware of the pool's unrealized losses. Interest income earned after that and losses on the sale of remaining investments had not yet been allocated at trial, but the Division's amended report assumed that at least "net losses attributable to the period after January 21, 1980, should be allocated at a uniform rate to Period III" (July 1, 1977 to January 21, 1980). Woodburn argues that "net losses" means that gains and losses were netted and so treated differently from other allocations. The record shows otherwise; the Division allocated individual gains and losses according to the same method used for earlier periods and did not first net the components.

Woodburn also argues that amounts gained or lost after January 21, 1980, should be allocated to January, 1980, rather than spread over the fiscal period that "closed" when the accounts were frozen. This is similar to its argument for monthly, rather than fiscal year, allocation. We conclude from the record that the Division's retroactive allocation was properly consistent with its allocation of other gains and losses. Mr. Miles, of the Division of Audits, believed that liquidation gain or loss of the investment pool would have to be allocated retroactively and that allocation to the last period would be more equitable than to earlier periods. This is consistent with the fiscal year allocation of other gains and losses that were spread over the periods in which they *should* have been realized. We have already concluded that such allocations were reasonable and equitable.

We conclude that, on the record before us, the Division's report was reasonable and equitable, considering the difficulty of the task, the time limitations, the cost of delay and of alternate methods, and the uncertainty whether alternate methods could result in any material difference.

Affirmed.

## APPENDIX

The Division of Audits' Report provides:

"A. Participant Accounts:

"1. The Treasurer operated in a pooled environment wherein investments were made for the benefit of all investment accounts pro-rata, and in which specific investments could not be identified with specific funds.

"2. The Treasurer attempted to comply with 35 Op. Atty. Gen. 1020 (No. 6885, December 23, 1971) and keep accounts fully invested. To accomplish this objective he relied upon written and verbal communications from public officers and employes, which in certain instances may not have been in compliance with ORS 294.035.

"3. The participants accounts maintained by the Treasurer were classified as follows:

"a. Political subdivisions:

"1) Generally:

"a) Investment Accounts - established to be invested for the benefit of the political subdivision. The amounts deposited or transferred to these accounts were authorized by a public official of the political subdivision. (Code I)

"b) Open Accounts - residual balances retained for operating purposes and subject to demand payout upon proper order of a public official. (Code G)

"2) Construction:

"a) Investment Accounts - same as above (Code I)

"b) Open Accounts - same as above (Code G)

"3) Bond and Interest:

"a) Investment Accounts - same as above (Code I)

"b) Open Accounts - available only for liquidation of bonded indebtedness for which the Treasurer was fiscal agent. Balances were kept fully invested by the Treasurer for the benefit of the fund. (Code I)

"c) Needs Accounts - segregations from the open or investment accounts for paying the principal and interest on matured bonds and coupons. These are residual balances subject to demand payout upon presentation of the debt instruments. (Code G)

"b. County Funds:

"1) Generally:

"a) Investment Accounts - established to designate those amounts to be invested for the benefit of a specific fund. The amounts deposited or transferred to these

accounts were authorized by a public official of the County. (Code I)

"b) Open Accounts - residual balances retained for operating purposes and subject to demand payout or transfer upon proper order of a public official. (Code G)

"c) Constitutional Accounts - amounts derived from constitutional sources. (Code C)

"d) Suspense Accounts - amounts held by the Treasurer for other public officials pending final disposition. (Code S)

"e) Undesignated - amounts available for disbursement for the purpose for which the fund was created. Undesignated accounts were classified as follows:

"1 - Reserve funds were classified as Investment Accounts. (Code I)

"2 - Funds held for distribution to other county funds or municipal corporations were classified as Investment Accounts. (Code I)

"3 - Funds available for current operations were classified as Open Acccounts. (Code G)

"4 - Funds containing federal and state grant moneys were classified as Marion County accounts even though they were available for current operations. (Code M)

"5 - Revolving and Internal Service funds were classified as Marion County accounts. (Code M)

"6 - Funds containing public contributions or donations were classified as Marion County accounts. (Code M)

"4. Accounts with the following classifications participate in all investment income, expense, gains and losses for the entire period:

"a. Investment Accounts (Code I)

"b. Constitutional Accounts (Code C)

"5. Open accounts, except for Bond and Interest Open Accounts, were considered residual cash balances with all investment income, expense, gains and losses going to the County General Fund through October 2, 1979. Effective October 3, 1979, the Open accounts participate in all investment income, expense, gains and losses in accordance with Section 8, Chapter 762, Oregon Laws 1979. (Code G)

"6. Bond and Interest Needs accounts were considered residual cash balances with all investment income, expense, gains and losses going to the County General Fund through October 2, 1979. Effective October 3, 1979, the

Bond and Interest Needs accounts participate in all investment income, expense, gains and losses in accordance with Section 8, Chapter 762, Oregon Laws 1979. (Code G)

"7. All investment income, expense, gains and losses attributable to those accounts classified as Suspense goes to the County General Fund. (Code S)

"8. All investment income, expense, gains and losses attributable to those accounts classified as Marion County go to the County General Fund. (Code M)

"B. Investment Income, Expense, Gains and Losses:

"1. Interest earned, rather than interest received, is to be allocated.

"a. Interest income for the 11 months ending June 30, 1978, was determined by multiplying the earnings for the fiscal year by 11/12.

"b. Interest income for fiscal year 1979 was obtained from the 'Report on Examination of the Marion County Treasurer's Balance Sheet' December 31, 1979, prepared by Touche Ross and Co. (Note C)

"c. Interest income for the period July 1, 1979, to December 31, 1979, was obtained from the same report as item a, interest for the period January 1, 1980, to January 21, 1980 was obtained from the County Treasurer's records.

"2. Interest on investments was earned at a uniform rate throughout each fiscal period.

"3. Unrealized losses occurred at a uniform rate during each fiscal period as market values declined. Securities transactions were obtained from the workpapers of Touche Ross & Co.

"4. Realized losses occurred at a uniform rate during the fiscal period in which the security was sold. Sales data was obtained from the workpapers of Touche Ross & Co.

"5. Interest expense on reverse repurchase agreements was incurred uniformally throughout the fiscal period. The amounts were obtained from the workpapers of Touche Ross & Co.

"6. Interest expense on losses financed by Blyth was incurred uniformally throughout the fiscal period. The amounts were obtained from the workpapers of Touche Ross & Co.

"7. Commitment fees received were earned uniformly during the fiscal period in which the purchase and sale of a security took place. The amounts were obtained from the workpapers of Touche Ross & Co.

"8. Unrealized losses on forward commitments outstanding at January 21, 1980, occurred uniformly throughout the fiscal period then ending as market values declined. The amount was obtained from documents furnished by the County Treasurer.

"9. Other revenues were earned uniformly throughout the fiscal period. The amount was obtained from the workpapers of Touche Ross & Co.

"10. All investment income, expense, gains and losses will be allocated to participant accounts on the basis of average daily balances throughout each fiscal period after correction for interest distributions.